

# THE ATTORNEY GENERAL

## OF TEXAS

### AUSTIN 11, TEXAS

GERALD C. MANN
~~XXXIII~~~~XXXIII~~
ATTORNEY GENERAL

Honorable H. L. Washburn
County Auditor
Harris County
Houston, Texas

Dear Sir:

Opinion No. O-5296
Re: (1) Authority of auditor to ap-
prove claims arising from perform-
ance of certain contract. (2)
Authority of Navigation District
Commissioners to act separately
at different times and places in
approving contracts and expendi-
tures. (3) Authority of auditor
to prescribe reasonable require-
ments to evidence approval of Com-
missioners before countersigning
warrants.

We have received and considered the opinion requests
contained in your letters of May 11, 1943, and June 1, 1943,
together with the exhibits attached thereto. Opinions sub-
mitted by Lewis and Knipp, attorneys at law, and by Mr. D.A.
Simmons, general counsel for the Houston Harris County Navi-
gation District, have also been received and have been most
helpful in our consideration of your requests.

Your original letter read in part as follows:

"As County Auditor for Harris County, I am
auditor for the Houston Harris County Naviga-
tion District under the provisions of Articles
1667 through 1673, as amended. The Navigation
District operates under Articles 8198 through
8228, and in counties of this size it has
special powers under Articles 8229 through 8244.
Certain employees of the District are provided
for under Article 8245 which article also relates
to the County Auditor and certain of his duties
and compensation.

"Over a period of years questions have arisen
with respect to the procedure required of the
Navigation District Commissioners in the award

of contracts and the payment of claims with
various opinions pro and con expressed by the
attorney for the Navigation District and by
the District Attorney of Harris County.  Of
late, the procedure adopted by the District
has settled into a practice of awarding con-
tracts, approving bills, and paying claims by
separate action of the individual commissioners
exercised at separate times and places, with-
out a meeting of the commissioners collective-
ly as a Board or notice to each commissioner
of the proposed action, which action is gen-
erally indicated by the signatures separately
attached of individual commissioners constitut-
ing a majority in number of the commissioners.

"More recently still, the Navigation District
entered into a contract with Richard R. Olmsted
to act as Carloader for the Navigation District
predicated on a previously executed contract be-
tween such District and certain railroads.  A copy
of this agreement is attached and marked 'Exhibit
A.'

"The terms of the agreement on the part of
Mr. Olmsted and the Navigation District are lengthy
and reference is made to these numerous provisions
as contained in the contract, from which it will be
observed that Mr. Olmsted will exercise, in connec-
tion with the work undertaken, the power to make
employments and purchases for which he will be com-
pensated by the District.  It is not proposed that
Mr. Olmsted will observe any of the requirements
laid down by statute for observance by the Naviga-
tion District in the making of contracts or the
purchase of supplies.  The Navigation District will
not directly make employments or pass upon the
merit of claims resulting from such contracts and
employments, but will at stated periods make reim-
bursement to Mr. Olmsted of all expenses incurred
by him.  The execution of this contract has focused
my attention directly upon the methods now adopted
to discharge functions devolved by statute upon
the Navigation Commissioners themselves and directly
raises the point as to whether or not the Naviga-
tion Commissioners may delegate to Mr. Olmsted the
discretion vested in them by law and necessary to the
discharge of their duties.

"This contract represents merely one phase of

the operations of the Navigation District.
There are other phases such as the operation of
the administrative office, warehousing, use of
docks, equipment, ship loading and unloading,
elevation of grain, and like items. Conceivably,
if this contract is sustained, the District may
by other contracts have performed all of its
services through the same media.

"In view of the obligation placed upon me
under Article 1669 to pass upon claims of the
District, it will be observed that one require-
ment is:

"'. . . he (the County Auditor) shall audit
and approve the same provided said bills have
been contracted in accordance with the law and
are found by him to be correct, . . . . .'

"Under this requirement, I desire to know whe-
ther or not the Olmsted contract is a legal con-
tract in view of its provisions and whether I am
authorized to approve reimbursement claims arising
from a performance of the contract by Olmsted.

"I submit an opinion of Lewis and Knipp, At-
torneys, dated May 1, 1943, rendered at my re-
quest, in the hope that the same may prove help-
ful in arriving at a correct conclusion.

"It will be observed that among the provi-
sions of Article 1669 is to be found the follow-
ing:

"'All warrants in payment of bills of any
such District shall be drawn and signed in ac-
cordance with the law governing the issuance of
warrants of such Districts.'

"Obviously from the provisions of this article
the auditor is required to find (a) that a legal
contract has been entered into by the Board and
(b) that the work is performed as a condition pre-
cedent to the issuance of the warrant in payment
of claims arising under a contract or for materials
and labor furnished under purchase contracts; and
further, when the warrant is presented (c) that it
is based upon a claim duly approved by the Board
and drawn under the provisions of the statute. In
view of practices now indulged of entering into con-

tracts, approving claims, and issuing warrants by
the separately given signatures of Navigation Dis-
trict Commissioners not meeting together but whose
approval is given and whose signatures are attached
at different times and places, there naturally
arises the question of the legality of these prac-
tices.  I attach an opinion rendered at my request
May 1, 1943, on this subject by Lewis and Knipp, with
the hope that it may be helpful in arriving at a
correct conclusion.

"I desire to know whether or not the Navigation
District Commissioners may not separately at dif-
ferent times and places in approving contracts and
expenditures on behalf of the District; whether it
is required that a given number of commissioners
sign warrants, or in what manner the approval of
contracts and expenditures may be evidenced.

"What authority do I have to prescribe reason-
able requirements to evidence the approval of the
Board of Navigation Commissioners before counter-
signing the warrants in payment of obligations
contracted by the District?"

From your letters we conclude that you desire our opinion
on the following questions:

(1)  Whether the Olmsted contract is a lawful contract,
and whether you are authorized to approve reimbursement claims
arising from a performance of the contract by Olmsted.

(2)  Whether the Navigation District Commissioners may
act separately at different times and places in approving con-
tracts and expenditures on behalf of the District.

(3)  Your authority to prescribe reasonable requirements
to evidence the approval of the Commissioners before you counter-
sign warrants in payment of obligations contracted by the Dis-
trict.

The contract between Olmsted and the Navigation District
contains the following provisions relative to the payment and
reimbursement of the former party:

"(5)  The Navigation District will reimburse
the Carloader for all costs and expenses of per-
forming the loading and unloading services under
this contract, and particularly the following
items:

"(a)  All labor costs for labor employed
and used in performing services prescribed
by this contract.

"(b)  Standard rates for the rental of
machinery, tools and equipment.

"(c)  Out-of-pocket cost for the repair
of machinery, tools and equipment.

"(d)  Net cost of all insurance and bonds
required under this contract.

"(e)  All damage claims when paid with
the approval of the Navigation District
in accordance with the terms of its con-
tract with the Railroads.

"(f)  Net cost of all materials and sup-
plies used in supporting, bracing, and
staking freight in or on cars.

"(g)  Salaries for revenue clerk, equip-
ment foremen, and checking clerks at rates
to be agreed on in advance by the Carloader
and the Port Director.

"(6)  The Navigation District, in addition to
the allowances hereinabove specified, will pay the
Carloader the sum of Two Hundred and Twenty-Five
Dollars ($225.00) per month, plus additional sum
based upon the following formula:"  (Here follows
a detailed formula whereby the compensation of the
Carloader may be increased by specified amounts
depending upon the amount of profit realized each
month by the Navigation District on its contract
with the Railroads.)

In your supplemental letter of June 1, 1943, you submit
the following facts in connection with the above quoted features
of the contract:

"In other words Olmsted fixes the rate of pay,
determines the amount to be paid, and pays it in
cash.  Subsequently, in accordance with the con-
tract previously submitted, he presents to the
Navigation Commissioners a bill for all of these
expenditures, which have been made without any
previous authorization or check of any character,
and the Navigation District proposes to reimburse

him in one lump sum each month for all such expenditures.

"In addition to the expenditures for labor, Olmsted will also pay in cash all expenses for materials, rentals on machinery, and other incidental related items. All of these are paid by Olmsted without any prior authorization by the Navigation Commissioners except as it may be covered by the contract submitted to you, and he is reimbursed monthly for them, along with expenditures for labor."

In Texas, districts and other organizations similar to Navigation Districts commonly are denominated "municipal corporations" or "quasi-municipal corporations." As such corporations they possess only such powers as are expressly granted to them or as are necessarily implied from those granted, and the courts are more loath to imply powers to such corporations than they are to imply them to cities and incorporated towns. Engelman Land Company v. Donna Irrigation District No. 1, 209 S.W. 428 (error refused); Dancy, et al. v. Wells, et al., 8 S.W. (2d) 198 (error refused).

In Tri-City Fresh Water Supply District v. Mann, 142 S.W. (2d) 945, the Supreme Court said with reference to the powers of a fresh water supply district:

"It is a general rule of judicial construction that even a normal municipal corporation has only such implied powers as are reasonably necessary to make effective the powers expressly granted. That is to say, such as are indispensable to the declared objects of the corporation and the accomplishment of the purposes of its creation. Powers which are not expressed and which are merely convenient or useful may not be included and cannot be maintained. Furthermore, where powers are granted to a municipality by specific provisions, such powers are not enlarged by general language found elsewhere in the act, such as is found in Article 7917, supra. (Citing cases) In discussing this subject this Court in the case of Foster v. City of Waco, 113 Tex. 352, 255 S.W. 1104, 1106, speaking through the late Chief Justice Cureton said: 'Any fair, reasonable, substantial doubt concerning the existence of power is resolved by the courts against the corporation, and the power is denied. Of every municipal corporation the charter or

statute by which it is created is its organic
act. Neither the corporation nor its officers
can do any act, or make any contract, or incur
any liability, not authorized thereby, or by
some legislative act applicable thereto. All
acts beyond the scope of the powers granted are
void.'

".  .  .  .  .  .  .

"What has been said relates primarily to
municipal corporations, proper, because what is
applicable to them is usually applicable to dis-
tricts such as that of relator, but with some
limitations. For one thing these districts do not
possess, at least the relator does not possess,
broad police powers to do those things which are
necessary to promote the public health and general
welfare, which are ordinarily expressly delegated
by statute to cities and towns, and by virtue of
which the governing bodies of such municipalities
are permitted to make rules and regulations and
enact ordinances, which if not expressly author-
ized, are very generally upheld by the courts as
being in the interest of the health and safety of
the inhabitants of the municipalities.

"Governmental agencies, or bodies corporate
such as Fresh Water Supply Districts, under our
statute, are commonly referred to by courts as
quasi municipal corporations, for the reason that
they are constituted by the legislature to exercise,
in a prescribed area, a very limited number of
corporate functions, and they are said to be 'low
down in the scale or grate of corporate existence.'
The powers of such districts are measured by the
terms of the statutes which authorized their creation,
and they can exercise no authority that has not
been clearly granted by the legislature. As ex-
pressed by the court in Stratton v. Commissioners'
Court of Kinney County, Tex. Civ. App., 137 S.W.
1170, 1177, writ of error denied, the powers of
such governmental agencies as counties, townships
and school districts 'are generally more strictly
construed than those of incorporated municipalities'.
(Citing cases) Numerous cases of similar import from
other jurisdictions might be cited." (Emphasis added).

In accordance with the ancient Latin maxim variously ex-
pressed "delegatus non potest delegare" or "delegata potestas

non potest delegare" it is a settled rule in this State that an officer or body in whom the legislature entrusts powers involving the exercise of discretion may not, without statutory authority, delegate to another the exercise of such powers. In Horne Zoological Arena Company v. City of Dallas, 45 S.W. (2d) 714 (Civ. App.) Judge Alexander, the present Chief Justice of our Supreme Court, said:

"The general rule is that, where the law creates a board to have charge of the affairs of a municipality, or a particular part thereof, such board may appoint agents to discharge ministerial duties not calling for the exercise of reason or discretion, but it cannot go beyond this and delegate to others the discharge of duties which call for reason or discretion, and which are regarded as a part of the public trust assumed by the members of such board. The power to exercise discretion in matters entrusted to such board cannot be delegated, surrendered, or bartered away."

Likewise, in the case of Nairn, et al. v. Bean, et al. 48 S.W. (2d) 584, 586, our Commission of Appeals stated:

"It is well settled that no governmental agency can, by contract or otherwise, suspend or surrender its functions, nor can it legally enter into any contract which will embarrass or control its legislative powers and duties, or which amount to an abdication thereof. Bowers v. City of Taylor, (Com. App.) 16 S.W. (2d) 520 and cases cited."

An apt application of these principles is to be found in the case of City of Corpus Christi v. Central Wharf & Warehouse Company, 27 S.W. 803 (Civ. App.). In that case a city possessing the power to "construct, erect, maintain, and own the wharves or piers" and to "fix the rates of wharfage and to collect the same on all goods, wares, and merchandise landed upon said wharves or piers" executed a contract with the defendant by which in effect the city surrendered to the defendant the right to collect the wharfage, but in which the city retained the right to a portion of the earnings of the defendant. The city fixed the maximum charge which the defendant would be permitted to assess, but allowed the defendant to fix the rates within this limit. In holding that the city could not delegate these powers, the then Judge Williams said:

"The power to provide for the improvement

of the harbor of Corpus Christi, and for the
erection and maintenance of public wharves, and
for the regulation of charges for their use, was
essentially legislative and belonged to the legis-
lature of the state. By the act in question it
was relinquished to the local government of the
city, to be exercised, in its legislative discre-
tion, for the best interests of the people. Such
powers as these, when conferred upon municipal
governments, cannot be delegated, surrendered, or
bartered away. 'The principle is a plain one
that the public powers of trusts devolved by law
or charter upon the council or governing body, to
be exercised by it when and in such manner as it
shall judge best, cannot be delegated to others.'
1 Dill. Mun. Corp. Par. 96. . . . . It is true
that a city may do by agent many things which it
is empowered to perform, as illustrated by the
authorities just referred to, as well as by the
case of Morris v. State, 62 Tex. 728, and many
others that might be cited. In order to build
and operate the wharves, piers, etc., and do other
things specified in its charter, it was necessary
for it to employ agents. But without express
authorization from the legislature it could not sur-
render the exercise of the powers so granted into the
unrestricted control of any person, and thus abandon
the discretion which it was expected at all times
to employ. The fact that a maximum rate of charges
was prescribed, and that it was stipulated that
vessels should be allowed to lie at the wharves free
of charge, does not alter the case. This was an
exercise of a portion of the legislative power
entrusted to the city, but it did not justify the
surrender of the residue to the wharf company for
the term of the lease. It was of the essence of
this power, and of the duty, which resulted, that
the city should be at all times free to alter these
regulations, or make others, as the interests of
the public demanded. Waterbury v. City of Laredo,
68 Tex. 576, 5 S.W. 81."

Under Article 8229, V.A.C.S., the Navigation District
in question possesses "the right, power and authority to ac-
quire, purchase, take over, construct, maintain, operate,
develop and regulate wharves, docks, warehouses, grain eleva-
tors, bunkering facilities, belt railroads, floating plants,
lighterage, lands, towing facilities, and all other facilities
or aids incident to or necessary to the operation or develop-
ment of ports or waterways, within the district and extending

to the Gulf of Mexico. . . . "    The Commissioners of this District have deemed it necessary and desirable that provision be made for the unloading of railway cars arriving at the wharves and docks and for placing the contents thereof in a position in which such contents may readily be loaded into steamships and barges.  The Olmsted contract is designed to provide these services.  We assume without discussion that the Commissioners possess the authority to provide such services and we shall direct our attention solely to the means by which they have attempted to accomplish this end.

Under the contract in question Olmsted is given carte blanche authority to employ any persons whom he desires, to employ any number of such persons, and -- with the exception of the revenue clerk, the equipment foremen, and the checking clerks -- to fix the salaries of such persons.  Moreover, he is given full and unlimited authority to procure materials and supplies used in supporting, bracing, and staking freight in or on the railway cars and to secure repairs for the machinery, tools and equipment which he owns and which he rents from the District.  The district unreservedly and unequivocally binds itself to reimburse him for all of his expenditures in these matters.  Persons employed by Olmsted are, by the terms of the contract, responsible to him alone and such persons look solely to him for directions concerning the nature and conduct of their work, and for the amount and payment of their salaries.  Repairs and materials are purchased by him in the amounts, of the kinds and at the prices which he alone deems desirable.  Olmsted's authority in these matters is, under the terms of the contract, complete and uncontrolled by the Navigation District.  Such vesting of authority is, we feel, directly contrary to the principles above discussed and constitutes an unauthorized delegation of the discretionary powers possessed by the Commissioners of the Navigation District.

Article 8245 V.A.C.S., provides:

"Such commissioners may employ such persons as they may deem necessary for the construction, maintenance, operation and development of the Navigation District, its business and facilities, prescribe their duties and fix their compensation . . . . "  (Emphasis added)

Under settled rules of construction, whenever the commissioners deem necessary the employment of any agents or employees, the word "may" as first used in this statute is to be read as if it were the word "must."  Raines v. Herring, 68 Tex. 468, 5 S.W. 369;  City of Dallas v. Street Railway Co., 95 Tex. 268, 66 S.W. 835;  Weber v. Rogan, 94 Tex. 62, 54 S.W. 1016, 55 S.W. 559, 57 S.W. 940;  Rock Island County Supervisors v. U. S., 4

Wall. 435, 18 L. Ed. 419.  In Smalley v. Paine, 116 S.W. 38, our Supreme Court said:

"The rule in the construction of statutes is universally established in the courts of common law that the word 'may' means 'must' whenever third persons or the public have an interest in having the act done or have a claim de jure that the power shall be exercised.  . . . ."

Since the acts of obtaining officers and employees, pre- scribing their duties and fixing their compensation have all been held to be acts of a legislative nature which involve dis- cretion (Taxpayers' Association v. City of Houston, 100 S.W. (2d) 1066, aff'd 105 S.W. (2d) 655), the specific statutory mention of these matters and the vesting of discretion with regard thereto in the Commissioners would alone justify the conclusion that the placing of these matters in the hands of Olmsted constitutes an unauthorized delegation.  Moreover, even if we assume that the word "may" was used in Article 8245 in a permissive rather than in a mandatory sense and even if we make the further assumption that the constructional maxim "expressio unius est exclusio alterius" has no application to a permissive vesting of powers, the delegation remains unau- thorized.

Of all the many powers vested in the Commissioners of Navigation Districts and in the governing bodies of other simi- lar corporations perhaps none involves more discretion and is more important or should be more closely guarded and confined than the powers possessed with reference to the funds of the corporation.  Such funds are accumulated only because the leg- islature has seen fit to clothe the corporation with the power to levy taxes -- a power which the courts strictly construe, State v. Houston & T.C. Ry. Co. 209 S.W. 820.  It is only logical that the powers with respect to the disposition of such fund should be construed with equal strictness.  If it be true that notwithstanding Article 8245 the Commissioners may in cer- tain circumstances delegate the performance of mechanical or ministerial tasks to a contractor and allow him to employ those who are to perform the tasks, we are satisfied that in making such a delegation the Commissioners may not in addition delegate the power to determine what amounts of District funds shall be spent and for what purposes the expenditures shall be made.  It is true that the instant contract delegates the purely ministeral task of unloading railway cars, but it accompanies this delega- tion with the highly discretionary power to decide how  much this task will cost the District and to determine the precise nature of the various items comprising such cost.  In our opinion, it is not sufficient for the Commissioners merely to

determine that they desire the performance of a certain task--
carloading, in the present case -- and then to surrender to
a contractor the power to make decisions regarding the manner
in which the task is to be performed and the amount which the
task is to cost the Navigation District. In the words of
Judge Williams, supra, such action is an exercise of but a
portion of the discretionary powers entrusted to the Commis-
sioners. We do not here attempt to enumerate all of those
decisions which the Commissioners must make before delegating
ministerial tasks, nor do we attempt to define the amount of
control which the Commissioners must retain over the perform-
ance of such tasks. It suffices here to say that any delegation
in which is surrendered the power to determine how much a given
task is to cost the District and in which is conferred absolute
discretion over the amount and nature of the expenditures for
a given task lies without the field of permissible delegation.
It is true that in the present contract Olmsted' compensation
depended in part on the profits accruing from certain railway
contracts and that under normal modes of human conduct he
would seek to keep down the expenses of his carloading activi-
ties since such expenses constitute one of the factors which
determine the existence and amount of profits from the railway
contracts. While as a matter of policy, the provision of such
an incentive doubtless is desirable, yet practically and legal-
ly such a provision is no substitute for the discretion which
the Commissioners must exercise over expenditures.

The briefs submitted on this question contain scholarly
arguments pro and con on the question of whether Olmsted is an
independent contractor under this contract; such arguments
apparently are predicated on the assumption that the delegation
of power to Olmsted is authorized if he is an independent con-
tractor but is unauthorized if he is a mere agent. Two consid-
erations cause us to refrain from entering into a lengthy dis-
cussion of this point: (1) If we should conclude that Olmsted
is an independent contractor with respect to the performance of
the actual carloadings, such conclusion would in no way prevent
the additional conclusion that with respect to the employing
of labor, the purchasing of supplies and materials, and the
determining of the amounts to be so expended he is an agent of
the District. Our Commission of Appeals has held with respect
to a "cost-plus" contract very similar to the one under dis-
cussion that a contractor may be an independent contractor for
some purposes of the contract but may still be an agent when
he purchases supplies for which he is to be reimbursed by his
employer, even though all of his acts arise out of the same con-
tract. Gilbert Mfg. Co. v. Connellee, 265 S.W. 375 (1924).
(2) If we should conclude that Olmsted is an independent con-
tractor with respect to all aspects of the contract, such con-
clusion would only serve to emphasis the vice of the delegation

therein made if, as in the case before us, the contract dealt with matters which may not be delegated.

Consequently, you are respectfully advised that the claims for reimbursement mentioned in your letters have not been contracted in accordance with law and that under Article 1669 you may decline to approve such claims.

We deem it unnecessary to write an extended discussion with reference to the second question above state. In an opinion of a former administration of this department, the then Attorney General C. M. Cureton carefully reviewed the authorities on this question and arrived at the followin conclusion:

> "The authorities in all jurisdictions hold that where a duty is conferred upon a Board or Commission composed of more than one member, and where his duty involves judgment and discretion, that it may not be performed by the members of the Board or Commission separately and individually, but that it must be performed by them meeting together and taking official action as a Board or Commission."

Since this opinion was written, the above conclusion has been amply sustained by the opinion of Chief Justice Alexander in Webster, et al. v. Texas & Pacific Motor Transport Company, et al., 166 S.W. (2d) 75. In our opinion, the foregoing authorities are conclusive upon this question and you are respectfully advised that the Navigation Commissioners may not act separately at different times and places in approving contracts and expenditures on behalf of the district.

With respect to your third question, Article 1669 provides that the proper officers of said district shall file all bills with the county auditor before payment and that he shall audit and approve the same provided said bills have been contracted in accordance with law and have been found by him to be correct, and that no bill shall be paid until the same has been thus audited and approved. If you have any doubt as to any contract, you are authorized to make any reasonable requirements in order to satisfy yourself, and if you are not satisfied after having made such reasonable requirements, you are authorized to decline to approve the account or the warrants issued in payment thereof.

Very truly yours

ATTORNEY GENERAL OF TEXAS

By s/R. Dean Moorhead
      R. Dean Moorhead
      Assistant

RDM:fo:wc

APPROVED JUN 19, 1943
s/Gerald C. Mann
ATTORNEY GENERAL OF TEXAS

Approved Opinion Committee by_s/BWB_Chairman